Good morning and may it please the court, Sarah Ottinger on behalf of the appellant Walter Porter. I represent him really in name only because I've become part of a long line of lawyers who in his mind is providing not just ineffective assistance of counsel but deliberately ineffective assistance of counsel. His paranoia interferes with the rational understanding of my role and he surely doesn't understand the nature of appellate proceedings. I will address today the erroneous finding of competence by the district court and the With competence, the standard of review in this court is not a clear error standard. It is what courts have called a hybrid standard or this court has called a species of clear error review. The Supreme Court has said that the district court decision should be overturned when although there is evidence to support the trial court's decision, still the reviewing court on the conviction that a mistake has been committed. While review is not de novo, the appellate court engages in a reanalysis of the facts and takes a hard look at the trial judge's ultimate conclusion. The government sets out an erroneous standard in its brief. The standard is not whether the decision is clearly arbitrary or unwarranted. The well-known constitutional definition applicable to competency is that if the defendant doesn't have a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, he is incompetent. And also a defendant must have a rational as well as factual understanding of the proceedings against him. And that's from Dusky. I submit that the district court erred when it picked and chose facts supporting competence rather than looking at the full picture of Mr. Porter's disabilities. First and foremost, when Mr. Porter met with his lawyers, they were unable to discuss the case rationally. Every single lawyer said that. Now, what do you do with what was a 62-page report finding competence? The 62-page report is what I'm addressing at this moment, Your Honor. The 62-page report is erroneous in many respects. And I can move on to addressing that. I would like to make the opinion of Mr. Porter that it is erroneous because there wasn't enough hard work put into it. Is it erroneous because the facts that are recited are untrue or what makes it erroneous? I know you disagree with it, but be specific. What makes it erroneous is that the district court picked and chose facts. It didn't look at the full factual picture in front of it. And so it definitely credited the state's psychologist who testified at the competency hearing. However, that state psychologist had had very little opportunity to assess Mr. Porter's competency. In fact, Mr. Porter quit communicating with him about his case not long into that competency evaluation. The defense expert who testified … Didn't the Bureau of Prisons doctor have more time with your client than the defense expert? I mean, he was there for months. And so it's not just the clinical settings, but they're observing him on a daily basis. They are, Your Honor. They're observing him on a daily basis, and he took a number of factors into account from observations that were made on a daily basis. And I think that there are essentially two problems with his conclusion as compared to the conclusion of defense, the defense expert, as well as the psychiatrist in the Bureau of Prisons, FMC Devens. The psychiatrist at Devens who met with Mr. Porter across those 10 months that he was there discharged him from Devens, and this is in Defense Exhibit 1, or Appellant's Exhibit 1 to Oral Argument, he discharged him from Devens with a diagnosis of psychotic disorder with hallucinations. And in fact, and that's at page 7658 of the Record on Appeal. In fact, there's a rule out malingering on that first page of the exhibit, but actually in his last meeting with Mr. Porter, that was added subsequently, because in his last meeting with Mr. Porter, he did not, he made a full diagnosis of psychotic disorder with hallucinations. And in fact. Did he determine that he was faking? He did not. Because he was reporting incidents that were bizarre, that were deliberately bizarre. He did not determine. I'm paying attention to them, which is not normal for a person who doesn't know what's going on. Right. Yes, Your Honor. Explain that. The, well, what Dr. Agarkar testified to at the hearing, and I think a critical issue in this case, is whether there is a combination here of not only a mental disorder, but also brain damage. And so what Dr. Agarkar explained at the hearing is that sometimes brain damage manifests in these very bizarre delusions that are not typical for schizophrenia, as Dr. Chanel testified. And so conceivably, the very information from which Dr. Chanel concluded that Mr. Porter was malingering was actually a symptom of brain damage, which could have been assessed by a neuropsychologist through neuropsychological testing, and would have defeated that argument that Mr. Porter was malingering. The second issue is that Dr. Chanel himself testified that it is possible to malinger some symptoms and yet still be mentally ill. And in fact, I cited in my brief, McWilliams v. Dunn, which is a Supreme Court case from 2017, and there the Supreme Court acknowledges in a very similar case that there were some diagnostic dilemmas with the defendant in that case. Because on the one hand, he was obviously, they say, quote, obviously attempting to appear emotionally disturbed, and yet, and that he was exaggerating his neuropsychological problems, and yet he had some very genuine neuropsychological problems as well, the defendant in that case. So Dr. Chanel as well agrees that it's possible to fake some symptoms, but that does not rule out that Mr. Porter was mentally ill or that he had brain damage. I think one of the difficulties with that 62-page opinion, Your Honor, is that it never takes into account the opinion of the attorneys who had the task of working with Mr. Porter. Medina, Supreme Court case, says that that is perhaps the most relevant information. And in fact, in this case, every single attorney in a long string of attorneys found it impossible to work with Mr. Porter. And that was because not just of the psychosis, but because of the way in which Mr. Porter communicated. Everyone agreed that that communication was a real problem. What he did, he had pressured speech, which means he talked very, very quickly. He perseverated when it came to his case. He had these recurring themes that came up that he wanted to talk about over and over and over again, and they generally had to do with his paranoia about defense counsel joining with the government, about the court joining with the government. And then he had what they call flight of ideas or disorganized thought process. Both doctors who testified at the hearing agreed on this. And so, you know, what attorneys repeatedly say who had to work with Mr. Porter was that they couldn't have a focused conversation with him about his case. He dwelt on these ideas about what the case involved. Those stemmed generally from his paranoia. And he would jump around so frequently that it was impossible to get back to what it was that they needed to discuss about his case. In the 62-page opinion, the district court found that Mr. Porter's behaviors were volitional. In other words, he can control whether he met with counsel, whether he met with the Why isn't that correct? And that's not correct because if, two things. First of all, certainly the speech patterns, everyone agreed that that was not volitional. And those speech patterns are what makes it. It's not just speech patterns. I mean, Agarkar testified that those are signs of neurological dysfunction. The rapid speech? The rapid speech, the flight of ideas, jumping from topic to topic, and the perseveration, which is going over and over and over the same thing without an ability to absorb anything else that the attorney is talking about. Those weren't volitional. Everyone agreed about that. That was how Mr. Porter communicated. And second of all, if Mr. Porter was paranoid, the choice that he's making is driven not by rationality, which would be volitional, it's driven by his paranoid delusion. It is, I mean, I would say that an analogy to that is that if a two-year-old runs out into the street into oncoming traffic, the two-year-old is hopefully, I mean, hopefully her parents have told her no, the two-year-old is disobeying her parents, and yet running out into traffic is an irrational decision. So it's volitional, but it's irrational. And in Mr. Porter's case, that's precisely what occurred. Well, the competency question comes down to whether he understands the proceedings. I don't think there's really a debate about that. And then about whether he can assist counsel. How do you get around the fact that, I mean, he's requesting venue changes, bills of particular, Jenks Act, and it seems like he's able to assist in the case if he wants to, given that he's, I mean, that's a lot more than most defendants do in a case. So those were obviously motions that were not filed, and so defense counsel obviously determined, you know, that they didn't need to file those. And so whatever his thought process went into, whatever the thought process was that went into saying that those motions needed to be filed wasn't rational in and of itself. It certainly shows a respectable level of cognitive ability, though. It shows some cognitive ability, but just an understanding of some principles of law and some facts, again, doesn't render Mr. Porter's ability to use the legal concepts rational. And I'd give another analogy, which is to a six-year-old who decides, because he's seen his parents drive a car many times, to get the key and unlock the car and get in and turn it on. And he can get all the way there because he knows what his parents do, but then when it comes to actually driving the car, the six-year-old simply can't do it. And that's where it is with Mr. Porter. He can throw out those terms. They don't necessarily make rational sense in his case, and they don't make rational sense in his case. And so his larger understanding of what's going on in the case is severely limited. I would say as another example on appeal, Mr. Porter has regularly written letters, which are part of the record in this Court, saying that he wants Brady and ineffective assistance of counsel raised. So he understands to some degree that Brady has to do with suppressed evidence, and ineffective assistance of counsel has to do with his lawyers not doing things that ought to be done. But he does not understand that those are not claims to be raised in an appeal. Those are claims that have to wait for post-conviction. And so that broader understanding of what's relevant, of what's important, is very irrational and is very much based on his delusions and paranoia about everybody working together in the system against him. I'm going to move on, if there aren't any other questions, to the denial of funding for neuropsychological evaluation. Defense counsel moved Dr. Agarkar, their defense expert, recommended that they get neuropsychological evaluation of Mr. Porter, and defense counsel actually twice prior to the competency hearing and once after the competency hearing moved for funding for a neuropsychological evaluation. Under Egg v. Oklahoma, the constitutional standard for granting the funding, the funding should have been granted if it was to be a significant issue at trial, or in this case at the competency hearing. And under 18 U.S.C. section 3006A, the funding should have been granted if it was necessary for adequate representation. The defense in this case could not have been more specific in its request and the need for neuropsychological evaluation. Their defense expert was saying that Mr. Porter exhibited classic signs of brain damage, which are some of the behaviors that we've talked about. Also Dr. Agarkar had been able to administer neuropsychological, I'm sorry, neurological screening and the results of that neurological screening indicated brain damage, specifically in the frontal and temporal lobes. And then in addition, as we've discussed, there were atypical symptoms of mental illness, which Dr. Chanel relied on to say Mr. Porter was malingering, but could also be accounted for by the results of a neuropsychological evaluation in the event that certain areas of Mr. Porter's brain were found to be damaged. The court assessed the request for neuropsychological evaluation using the wrong legal standard. It framed the question as whether he was entitled to neuropsychological evaluation were evaluated by two prior doctors and the court found prior to the hearing that the need for neuropsychological evaluation had not been established. The court actually, prior to granting the funding for neuropsychological evaluation, wanted proof at a hearing, which simply isn't the standard for requesting funding. Your initial time has expired and you've saved time for rebuttal. Thank you, Your Honor. Thank you, Judge Smith. May it please the court. Legal competency is not determined by any one specific behavioral trait by a defendant. It's not based on the time it takes an attorney to talk to them. It's not based on the time it takes a doctor to examine them. Rather, the longstanding test for competency is a two-part question. Does the defendant suffer from a mental disease or mental defect? And if so, does that mental disease or defect render that defendant incapable of understanding the proceedings or assisting his attorney? In finding Walter Porter competent in this case, two trial judges at a joint competency hearing did exactly what this court has instructed them to do and considered the expert medical testimony that was put before them, the expert medical records that was put before them, as well as their own observations. And they found Walter Porter to be competent to proceed. And no matter what reanalysis of the facts the court takes on review, no matter how hard you look at the court's decision, the facts and the evidence in this case will not change. And the facts in this evidence, in this case, support the finding of the district court and that finding is not clearly arbitrary or unwarranted. And Judge Smith, you pointed out about or asked questions about what are the facts and counsel's talking about the district court picked and chose facts here. But that was not the case. The court clearly said in its 62-page opinion, it clearly listened to everything. It closely examined Dr. Agarkar's report and his testimony. But as you said, Judge Costa, you did have one doctor. Dr. Schnell had several months at the facility of examining Mr. Porter. He had the benefit of having other people at the facility observe him and the notes of others in making a decision over several months where Dr. Agarkar had about 14 to 15 hours. And whether there would have been more neuropsychological testing or whether there would have been a continuance, Dr. Agarkar would have never had the 7 or 8 months that Dr. Schnell had and had that. And as this court recognized, I believe in the McKnight case, that can be a consideration that the doctor takes, that the court takes into consideration. And as far as the disagreement between whether the judge credited one expert over the other or whether it ignored Dr. Agarkar. First of all, the district court did not ignore Dr. Agarkar's testimony and specifically said so. But the fact that it credited one expert over another is not a problem. This was the function of the trial court, as this court has said before. And this court has always given great deference to the district courts who make findings in expert situations. And this court certainly does not relitigate the battle of the experts. That is the function of the trial court. And in here, it was done. The court was tasked to make that decision and the court did so. And there are very many facts that support the decision. I'll go through some of them. On the first question first, the finding that Mr. Porter was malingering and that he did not suffer from a mental disease or defect. Several categories were given in testimony by Dr. Schnell. But first, the onset of late symptoms. Something very atypical of someone suffering genuine psychosis. The records in the case, his history, did not reveal any sign of major mental illness until his arrest in this case. When Mr. Porter first met with Dr. Agarkar, he wasn't reporting hallucinations or symptoms. However, when he got to the Devens facility, those symptoms started presenting themselves. And although he was 38 when the symptoms first presented, both Dr. Agarkar and Dr. Schnell said most of the time, those symptoms will onset by the age of mid-20s. So as this court kind of mentioned in the Francisco case, this convenient onset of symptoms following the charges is something that the court can consider in making its determination of malingering. Is that unusual for a patient who's supposed to be suffering from mental illness to self-report acts of delusion or? Absolutely, Judge Clement. And that's another thing that was a big part of the district. Is it unusual to yes or no? It's unusual. It's unusual. That's correct, Judge Clement. And that's something that Dr. Schnell testified to and something that the district court relied on. He often volunteered how impaired he was. He reported his own supposed suicide attempts, which neither expert believed was an actual suicide attempt. But one of, I think, the most, one of the big ones that Dr. Schnell relied on was a tiger with a tail and said, I was tripping out seeing that. Well, as Dr. Schnell testified, it's one thing to have a psychotic disorder. It's another thing to recognize you're having the symptom while you're actually having the symptom and report it. And that was another typical sign. But in addition to that, as you pointed out, constantly telling the staff, hey, I'm drinking my urine. Did you note that in the report? I cut myself. Please note that. And even though this is not things that people suffering, generally suffering episodes of psychosis would do. In addition to that, his other behavior was fine. His hygiene was good. His grooming was good. He didn't need any help with anything. And he was getting along or at least having interaction with other people at the facility and recreation yards. Another very typical thing was his reaction to antipsychotic medications. While he was not presenting with any or reporting any hallucinations before he came to Devins, when at Devins he was put on antipsychotic medications. However, his conditions got worse, exactly the opposite of what the medication was supposed to do. Dr. Schnell said seven months in, he's reporting still seeing snakes in the toilet that the docs are poisoning him, he's drinking his urine, and having command hallucinations, all things that should not have been happening while he's on the medicine. As Dr. Schnell testified, that's powerful data that there was no psychosis and this was malingering. And that's something the court could rely on. On the volitional side, which went actually to show that he wasn't suffering from a mental disease or defect and that he could also assist his lawyer, is that the fact he chose not to talk to his doctors at Devins. He was observed by staff members, having conversations with other inmates, having conversations with the correctional officers, but he walked away from the doctors. He was less willing to talk to Dr. Schnell, who was the doctor at Devins as time went on, but he talked more to Dr. Agarkar. And Dr. Agarkar testified that he suspected that's because he wasn't a government doctor. So we have a way, we have an ability, not an inability to talk, we have an ability to talk in choosing to talk to one person over another, one doctor over another. As far as some basic tests that counsel was talking about, especially for the neuropsychological, these were tests that Mr. Porter would have had to take part in. And the testimony showed he wasn't taking part in the basic test. And that's something Dr. Schnell said in his experience only occurs volitionally. That's at page 6413 of the record and also 6500 and 5873, the Devins staff tried at least eight or nine times to get Mr. Porter to cooperate with these tests and it didn't happen. So it would have been foolish to fund neuropsychological testing based on his history at Devins. That's correct, Your Honor. And both doctors testified he would have had to cooperate to have that neuropsychological exam and the court pointed that out. That's one other reason it would be pointless. If he's not cooperating with basic tests, he's not cooperating. But to also see how this was a choice, some of the evidence that the doctors relied on involved phone calls between Mr. Porter and his mother. And one I'll talk about real quick because there was a 28J filed recently in this case about one particular call that occurred on March 5th, 2015. And we've cited in our brief, and I'll just, forgive me for the language, where the intern made notes and Dr. Chanel testified that one of the calls Mr. Porter testified to his mom, I'm going to fuck with my attorneys. Counsel, opposing counsel listened to the call and sent me the tape as well. And it sounds like the statement is actually, I'm fucked with my attorneys. That's how I hear it as well. But the intern's notes are at page 50, I'm sorry, page 6,002 to 6,004 of the record. And you'll see the intern's interpretation. But I bring that up just to clarify, but if you look at that call and if you listen to that call, and I believe it may be at Exhibit 19 of the record, the call is going to be indicative of willfulness. That statement aside, the call shows he knows what he's doing. And it's summarized correctly at page 5781 in the report of the Chanel report in 6,003. He says very clearly that he doesn't want to talk to his lawyers. He doesn't want to talk to the doctors. All they want me to do is plea out for the government. They never file anything I want. This is not someone who can't talk to someone. This is someone who is choosing not to. And if you do listen to that call, you're not going to hear rapid fire speech. You're not going to hear someone perseverating in an issue. You're going to hear someone on the phone telling his mom, I don't want to talk to you about this case. They're listening to what I say, showing an awareness that's going on. So that was another thing the district court had in the testimony of Dr. Chanel. Likely, Judge Costa, they also had something that you pointed out, all the legal letters that Mr. Porter was doing. And while he may have been legally incorrect with what he was saying, it showed that he is listening to what's going on. He's aware of things. He was looking for a venue change. He was bringing up the online commenting by former AUSA Perricone in the office. He was looking for motions to be dismissed. This was not delusional, as counsel opposes. In fact, as the district court noted, it's not a delusional conspiracy at all. His belief that everybody was out to get him was rooted in reality. It was a skewed perception, but it was the facts he gave. Because the facts were, his first lawyer did meet with him and the government, with AUSA Landrieu, about plea negotiations. He did not, his first lawyer did not file motions that he wanted to file. His lawyer did not seek to dismiss. There were plea negotiations in an attempt to see if Mr. Porter would cooperate. And he did want to discuss the media comments, but it didn't happen. And so you see there a disagreement with counsel, a disagreement that has gone over. He doesn't like his attorneys. He didn't want to listen to his attorneys because they weren't doing what he wanted. That's not an inability. It's not unable to talk with your attorneys. It's not unable to assist. It's just you're not assisting. And distrust of court-appointed attorneys is certainly not uncommon. I'm sure this court's aware of that, as were both doctors in this case. But bizarre, volatile, and seemingly irrational behavior does not make someone incompetent. And as the Eighth Circuit case, we pointed to the Gaines case, the pro se filings and interruptions generally reflect a defendant who disagrees with attorney conduct. That doesn't make you incompetent. Was he stressed? Was he pressured speech? Yes. And both judges at the hearing recognized that. He had been charged with three high-profile cases, one of them at one point carrying a possibility of a death penalty. The judges certainly understood that. But still, that didn't make him incompetent. And when he actually did go on rants, when he made outbursts in the courtroom disturbing it, it was always related to testimony that was going on. As Judge Feldman made a point of saying, he seems to be understanding what the witness is saying. So it wasn't just a random outburst that had no control of anything. It had something to do with this. Ms. Ottenger points out that, in her view, the report didn't consider the opinions of the attorneys who had tried to work with Mr. Porter. Can you comment on that? Sure, Judge Smith. And as we pointed out in the brief, it's certainly the 62-page opinion doesn't reflect that, that the court considered it in the words. But I think it's – I don't think it's correct to look at it just like that. This was a long process. The court stated it was very well aware of the history. This was a case going back to – the first case indicted was 12-001. So the first case indicted in 2012, and this is 2015. The court was very well aware of everything. It had, I believe, Ms. Forney's affidavit that set the whole first thing in motion way back at the first one. So while it's not in the 62-page opinion, I don't think that means the court wasn't aware of it. And in any event, as Ms. Ottinger also said, there was no doubt that he was a difficult client. The judges specifically put that in their opinion. Nobody doubted that he perseverated. Nobody doubted that he had rapid speech. Nobody doubted that he was going to be hard to work with and that he had been hard to work with. So that was really never in question. So the fact that the 62-page does not mention Mr. Craft's testimony or Ms. Forney's affidavit, would it have been nice to be in there? Maybe, but I don't think it makes a difference, and I don't think it undercuts here, because these are two, the two judges that have there are very experienced trial judges, have been through these type of hearings before, and they knew the record in this case, and I think it's safe to say that. Ultimately, as we just said, no one denies he was a difficult client. No one denies that at all, much less the judges or either doctor. But a difficult client is not incompetent just because he's difficult. A difficult client is not incompetent just because it takes so much time with a lawyer to deal with him. A difficult client is not incompetent when he just wants to do something else. And a defendant who intentionally chooses not to talk to his attorney, though he will talk to some people, not to talk about his case, though he'll talk about other things, not to talk with this doctor, but he'll talk with this doctor. A defendant who intentionally does that cannot be incompetent, because he is intentionally doing things. Here, in this matter, the court did what this court, the district court did what this court had said. It listened to the experts. It read the reports. It considered its own observations during the hearing. It had a wealth of knowledge with which to make its decision, and it found Walter Porter to be competent. Based on the record evidence in this case, the record evidence that's before this court, the record evidence that was before that court, that was the correct decision. It was not clearly unwarranted. It was not clearly arbitrary. And unless the court has any other questions at this time, I'll conclude and ask that this court affirm the lower rule. All right, thank you. Thank you, Your Honors. Ms. Agar, you've saved time for rebuttal. I did. Thank you, Your Honor. I want to make a couple of really significant points. First of all, Dr. Chanel was not someone who was qualified in neuropsychology or even in neurological issues. Dr. Agarkar was a neuropsychiatrist. Now, Dr. Chanel testified that he really didn't know, you know, what might account for the kind of behaviors that one saw when trying to communicate with Mr. Porter, but he was not able to refer Mr. Porter for neuropsychological evaluation because he didn't have the preliminary testing in order to do so. That was not his area of expertise. Dr. Agarkar was, in fact, able to administer screening and did, in fact, know that that neuropsychological evaluation needed to be done in order to reach a full diagnosis. And yet the court denied defense the opportunity to do that. If I had retained at trial an expert who recommended that further testing be done and I didn't do it, I would be found to be ineffective. And I think, you know, one of the standards that we look at with respect to awarding the defense, the funding for experts is, you know, would you pursue that with a private client who could pay? And, of course, you would have pursued it with a private client who could pay. But what if the private client wouldn't cooperate with the testing, just like this client wouldn't cooperate? Well, and I, you know, the government says that, and I think this is a critical point, that Mr. Porter did cooperate with Dr. Agarkar, and Dr. Agarkar suspected that he did not cooperate with Dr. Chanel because he saw Dr. Chanel as part of the government. The defense did not have trouble getting an evaluation, although it was a little more persistent. Dr. Agarkar testified that there were times that Mr. Porter wouldn't see him, but he returned. And there were times that Mr. Porter would see him. Dr. Agarkar, again a neuropsychiatrist, testified that even if Mr. Porter participated in partial neuropsychological testing, there would still likely be enough data from partial participation to make conclusions regarding his behaviors. I think what I really want to stress with respect to malingering is this. First of all, again, a neuropsychiatrist testifying that those behaviors are indicative of brain damage, and yet defense was not able to rebut them as malingering because the defense was not able to have neuropsychological testing done. All right. Thank you, Ms. Ott. Thank you. Your case is under submission. We notice that you're court-appointed, and we appreciate your service for your client and your willingness to take the appointment. Thank you. Next case, Barrett v. H.